### VOORHEES v. OLMSTEAD.

*Estoppel — what constitutes an equitable — affirmative action in consequence of act claimed as estoppel not necessary.*

V., on the 2d of May, contracted to sell to B. cotton on store in a warehouse to be delivered and paid for within ten days. On the 8th of May the delivery, which consisted in sorting and marking it with the mark of B. at the warehouse, commenced. On that day B. contracted with the W. company for a loan on the pledge of the cotton, giving the company an invoice and an order upon the warehouseman, which represented the cotton to be stored for B., and directed the delivery of a receipt therefor to the company, and on the same day a check for the amount of the loan was given by the company to B., and by him deposited to his credit in a bank. The company's agent, the same day, presented the order to the warehouseman, who stated that the cotton was being then delivered, and that a receipt would be ready the next day. The next day the warehouseman notified V. that the receipt was called for by B., and V. directed it to be given, but did not designate whether it should be negotiable or not. The warehouseman gave a nego tiable receipt in the name of B. to the company. The delivery was completed that day. On the 11th, the next business day, V. applied to B. for

Voorhees v. Olmstead.

payment, but was put off till the next day. On that day V. was informed that B. had failed, and the W. company had the receipt for the cotton. On the 8th and 9th B. had to his credit in the bank on deposit a sum more than the amount loaned on the cotton, but on the 11th this was nearly drawn out.

*Held*, (1) that although at the time the loan was contracted, and the checks given to B., he had no title to the cotton, the transaction up to the time the receipt was given the W. company was a single one, and the pledge of the cotton was not to secure an antecedent indebtedness; (2) that although the company did not, as against V., on the 8th of May acquire any interest in the cotton, the direction of V. to give a receipt to B., and the action upon it by the warehouseman having induced the W. company to rely upon the claim of title by B., and neglect such legal steps as it could have taken to secure itself on the 9th, under the circumstances, constituted an estoppel *in pais* as to the W. company against B. *Held*, also, that the fact that V. did not direct the giving of a negotiable receipt did not affect the matter.

It is not necessary to an equitable estoppel that the party should willfully intended to mislead, nor that the party who claims the estoppel shall have acted affirmatively upon it. It is enough if he shall have been induced to refrain from such action as lay in his power by which he might have retrieved his position and saved himself from loss.

MOTION by plaintiff for a new trial upon a case and exceptions ordered to be heard in the first instance at the general term after a verdict for the defendants directed at the circuit.

The action was one of replevin brought by Benjamin F. Voorhees and others against Cyrus Olmstead and others to recover the possession of a quantity of cotton. The facts fully appear in the opinion.

*Beach & Brown* and *Wm. W. McFarland,* for plaintiffs, cited 6 Edm. Stat. at Large, 668; 4 id. 461; *Yenni* v. *McNamee* 45 N. Y. 614; *Kein* v. *Tupper,* 52 id. 550; *Ballard* v. *Burgett,* 40 id. 314; *Hutchings* v. *Munger,* 41 id. 155; *McNeil* v. *Tenth Nat'l Bank,* 46 id. 325; *Coggill* v. *Hfd. & N. H. R. R.,* 3 Gray, 545; *Leighton* v. *Stevens,* 19 Me. 154 ; *Churchill* v. *Bailey,* 13 id. 64 ; *Comstock* v. *Smith,* 23 id. 202; *Luey* v. *Bundy,* 9 N. H. 298; *Manwell* v. *Briggs,* 17 Vt. 176; *Bradley* v. *Arnold,* 16 id. 382; *Fairbank* v. *Phelps,* 22 Pick. 535; *Dresser Manuf. Co.* v. *Waterston,* 3 Metc. 9; *Lehigh* v. *Field,* 8 Watts & Serg. 232; *McBride* v. *Whitehead,* Ga. Dec. Part I, 165; *Bennett* v. *Sims,* 1 Rice, 421; *Bradshaw* v. *Thomas,* 7 Yerger, 497; *Reeves* v. *Harris,* 1 Bailey, 563; *Marston* v. *Baldwin,* 17 Mass. 606; *George* v. *Stubbs,* 26 Me. 243; *Herring* v. *Willard,* 2 Sandf. 418; *Buckmaster* v. *Smith,* 22 Vt. 409; *Etty* v. *Aldrich,* 46 N. H.

127; *Patton* v. *McCane*, 15 B. Monr. 555 ; *Acker* v. *Campbell*, id. 372; *Powell* v. *Bradlee*, 9 Gill & Johns. 220; *Blanchard* v. *Child*, 7 Gray, 155; *Burbank* v. *Crooker*, id. 158; *Goodwin* v. *May*, 23 Ga. 205; *Deshon* v. *Bigelow*, 8 Gray, 159; *Cragin* v. *Coe*, 29 Conn. 51; *Plummer* v. *Shirley*, 16 Ind. 480.

*Evarts, Southmayd & Choate*, for defendants.

Present — DAVIS, P. J., DANIELS and JAMES, JJ.

DAVIS, P. J. This action was brought to recover possession of 226 bales of cotton. The court, at circuit, directed a verdict for the defendants. We think the court did not err in the conclusion that the case was a proper one to be disposed of by directing a verdict. There was not sufficient evidence to have justified the jury in finding that the Warehouse and Security Company acted *mala fide* in the transaction. They were not shown to have had any participation in a knowledge of the alleged fraudulent acts and violations of Biddle & Co., nor to have had any notice that should have put them on inquiry touching the same. There was no substantial dispute as to the facts of the case. There was some conflicting evidence as to the time when the warehouse receipt was delivered to the company, but the court must be held to have assumed that such delivery was made after the weighing, etc., of the cotton was completed on Saturday, which is in accordance with the plaintiff's evidence. The facts of the case are these.

James Phelan was the owner and had possession of 226 bales of cotton on store in the warehouse of Cyrus Olmstead, and for which he held Olmstead's non-negotiable receipt. On the 22d of April, 1868, he contracted to sell the cotton to the plaintiffs, Voorhees & Garrison, to be delivered and paid for in twenty days. On the next day, Voorhees & Garrison sold a half interest in the cotton to the plaintiffs, Solon W. Dewey and Solon W. Dewey, Jr., to be delivered and paid for in nineteen days, and the last-named purchasers left their interest in the cotton with Voorhees & Garrison, for sale.

On the 2d day of May, Voorhees & Garrison sold the whole of the cotton to Biddle & Co., to be delivered and paid for within ten days. On the 7th of May, Biddle & Co. drew a delivery order for the cotton on Voorhees & Garrison, and thereupon the latter firm

made arrangements to commence the delivery of the cotton on the following morning. They sent a delivery order to Phelan, asking him to deliver the cotton to bearer, who gave an order on the warehouseman to the same effect. On the morning of the 8th, the out-door clerk of Voorhees & Garrison attended at the warehouse to receive delivery from Phelan, and make delivery to Biddle & Co. The receiver and sampler of Biddle & Co. was there, and the work of delivering the cotton commenced at about 11 o'clock of that morning. The bales of cotton were weighed, and as they left the scales were sampled and marked "(S. O.)" which was the cotton mark of Biddle & Co. It was the intention of Voorhees & Garrison that one delivery should operate for all; that is, as a delivery from Phelan to them — and from them of one-half to Dewey & Co., and of the whole to Biddle & Co.; and this course was in accordance with the usages of dealing in cotton. The cotton as soon as delivered was returned to the same warehouse and stored by Biddle & Co.

On the 8th day of May, and while the delivery was in progress, Biddle & Co. applied to the Warehouse & Security Company for a loan on this and other cotton, amounting to some 353 bales, at the rate of twenty-five cents a pound. The invoice of the cotton was made out by them, describing it in substance as 350 bales in Olmstead's warehouse, and three bales elsewhere, and a contract was entered into for the loan of $44,000 on the cotton mentioned in the invoice. An order was drawn by Biddle & Co. on the warehouseman, Olmstead, to deliver to the Warehouse & Security Company the receipt for 350 bales of cotton stored with him for Biddle & Co., and on the same day the check of the Warehouse & Security Co., on the National Bank of the Republic, for $44,000, was given to Biddle & Co., who deposited it to their own credit in the National City Bank of New York. An agent of the Warehouse & Security Company was sent with the order to the warehouse, where he presented the order and called for the receipt. He was told by Olmstead that the cotton was then being turned over, and that if he called the next day the receipt would be ready. One hundred bales of the cotton were weighed, sampled and marked "(O. S.)" on the 8th of May, and on the following day, which was Saturday, the weighing, sampling and marking was completed at about three o'clock in the afternoon. The whole of the 226 bales in question were weighed, sampled and marked, but seven bales of another lot, which would have made

the 350, were rejected.   On Saturday, Olmstead, before the delivery was completed, notified the clerk of Voorhees & Garrison that the receipt was called for by Biddle & Co.; he went to their store and told them of the request, and was directed to go back and tell Olmstead to "Give it to them, of course."   The clerk returned and directed Olmstead accordingly.   In the course of the afternoon, and after the delivery was completed, Olmstead delivered to the agent of the Warehouse & Security Company a warehouse receipt, acknowledging the receipt in store, from Biddle & Co., of 343 bales of cotton.   This receipt was negotiable in form, and was immediately taken to the Warehouse & Security Company.   On Saturday afternoon, but after business hours, Voorhees & Garreson made out a bill for the 226 bales, and sent it to the office of Biddle & Co., but, finding no one in, it was pushed under the door.   On Monday following, they sent for the money, but were told in substance that it was not payable till the next day.   According to the usage of business the bill was payable on Tuesday, the 12th.   On sending to collect the bill on that day they were told that Biddle & Co. had suspended payment, and that the Warehouse & Security Company had the receipt for the cotton.   On the 13th they served notice on that company that the cotton had not been paid for, and that they claimed the same, and demanded its delivery to them.   The company refused to deliver the cotton, claiming that they held and were entitled to hold it as security for the loan of $44,000.

It appeared also that at the close of bank hours, on the 8th day of May, there appeared to the credit of Biddle & Co., on the books of the bank where they deposited the check of $44,000, a balance of $52,377, and on the evening of Saturday, the 9th, a balance of $31,878.96, which was drawn down on the 11th to $2,083.75, and on the 13th to $448.18.

On the 13th of May, this suit was commenced to recover the property.   There can be no "doubt upon this state of facts, that both the title and possession of the cotton remained in Phelan, until the delivery to Biddle & Co. was complete on the afternoon of Saturday the 9th of May.   *Kein* v. *Tupper*, 52 N. Y. 550, and cases there cited.   On the completion of such delivery, the title and possession passed from Phelan, through Voorhees and Garrison, to Biddle & Co.   But as the sale to the last-named firm was for cash, payable on delivery, according to the usage of the trade, the delivery and possession were, as between that firm and Voorhees &

Voorhees v. Olmstead.

Garrison, conditional upon payment for the cotton; as between them the right of recaption clearly existed on the discovery of the insolvency of the purchasers on the 12th day of May. The questions of the case are, therefore, whether the Warehouse & Security Company are entitled upon the facts to hold the cotton as security for the loan of $44,000 as *bona fide* purchasers *pro tanto*, or whether any such condition of things existed that they are entitled upon the doctrine of estoppel to shut off the assertion of any superior right on the part of plaintiffs.

There can be no doubt, we think, that the loan was intended to be and was made by the company upon the security of the cotton, and in the belief that the transaction would be consummated by the delivery of possession, in the form of a warehouseman's receipt, on the presentation of the order of Biddle & Co. It is true that the company intrusted their check to Biddle & Co. before receiving the warehouse receipt, but that fact, under the circumstances of the case, does not show that they intended to make a loan to be secured by a pledge thereafter to be made. Each successive step in the arrangement for the loan and security to and including the receiving by the company of the warehouse receipt on Saturday afternoon, are facts of a single transaction carried on in apparent good faith with a single object, to wit, the making of a loan to be secured by the possession and, so far as necessary, by the title of the cotton. As between the company and Biddle & Co. there could be no question of this, nor could there be any doubt if Biddle & Co. had defeated the obtaining of the warehouseman's receipt on Saturday, the right of recaption of the check or money as against them, would have been complete, and for the same reason that the plaintiff's right to retake the cotton on failure to pay for it was perfect as between themselves and Biddle & Co. It is, therefore, not sound in law or in fact to assert that the pledge of the cotton was made at the time of the delivery of the warehouseman's receipt as security for a precedent debt. That delivery was the consummation of a transaction remaining inconsummate until that event, and that act was as between the parties to the transaction a perfected pledge to secure a loan, of which it was the consideration, and not a pledge to secure an antecedent indebtedness. But this view of the law and fact as between the parties to the loan does not dispose of the question between the plaintiffs and the Warehouse and Security Company. As between them the question is whether the latter parted

with the money or with some valuable thing upon the delivery of the possession and apparent title of 226 bales of cotton under circumstances in which they can claim to be *bona fide* purchasers. On the 8th day of May, when Biddle & Co. applied for the loan, they had no title to the cotton and no right to the possession. All they had was a contract for its purchase, and an order for its delivery upon such contract. They were at that time incapable of transferring any thing more than they had. They could of course sell the cotton as their vendors had sold to them, but that would, in legal effect, only have given the right to acquire title and possession by doing what they and their vendors were bound to do. It would operate as the assignment of an executory contract of property, of which Phelan was the owner in possession subject to the right of the intermediate dealers, through whom the title and possession were only obtainable. Biddle & Co. were not in possession of any documentary evidence of title. The company were not deceived by the exhibition of such apparent evidence. On the contrary, the papers given to them were notice that Biddle & Co. did not then possess such evidence. The invoice rose no higher than their personal assertion of title, while the order on the warehouseman for a receipt for the cotton was notice that the evidence had not yet been delivered to them. It cannot, therefore, be that the company was induced, on the 8th of May, to part with their money or check upon any thing higher than the assertion of Biddle & Co. that they owned the cotton and had a right to call for and receive a warehouseman's receipt. We think it cannot be claimed within any of the authorities that, on the 8th day of May, the Warehouse & Security Company had acquired any interest in the cotton that could be set up to affect the rights of the plaintiffs.

The question then is whether any thing subsequently transpired to change their relation to the property, and entitle them to assert a better right than they got on the delivery of their check to Biddle & Co. We have seen that as a part of an incomplete transaction between themselves and Biddle & Co. they were authorized to call for and receive a warehouse receipt for the cotton, which if it had been presented and delivered to them, when they gave their check on the 8th, would have made them purchasers for value to the extent of their loan. They were to do this for the purpose of consummating the transaction with Biddle & Co., and as part of it, and not as a separate matter. When that order was presented, the company

found the warehouseman, upon whom it was drawn, in the act of making delivery of the cotton to Biddle & Co., under the order of Phelan, the owner, and the order of Voorhees & Garrison to deliver " to bearer." Their agent was informed by the warehouseman that the cotton was then being turned over, and told to come the next day and the receipt would be given. On the next day, and before the delivery was complete, the warehouseman informed the clerk of the plaintiffs, that Biddle & Co. wanted the receipt for the cotton. The clerk immediately went to the plaintiffs and stated to them that Biddle & Co. wanted the receipt, and asked if it should be given, the reply was "Certainly, give it to him, of course." This answer was reported to the warehouseman, and acting upon it, he, as soon as the delivery of the cotton was finished, gave to the agent of the Warehouse & Security Co., upon Biddle & Co.'s order, a receipt for 343 bales of cotton, which included the 226 bales in question. Nothing was said about the form of the receipt by plaintiffs, but their *silence* authorized the giving of a negotiable one, if in accordance with the usage of business. By this consent and act of the plaintiffs, the transaction of the loan, upon the pledge of the cotton, between the company and Biddle & Co. became complete, according to the intention of the parties, and no one can doubt that if Biddle & Co. had paid for the cotton on Tuesday following, the Warehouse & Security Company could have held it against them and every one.

This act is claimed to be a *ratification* on the part of the plaintiffs of the arrangements to pledge the cotton made by Biddle & Co. But the idea of ratification necessarily implies knowledge of the subject-matter ratified, and as it does not appear that plaintiffs, when they directed the receipt to be given, knew of the loan, and its conditions, and of the order of Biddle & Co. to deliver the receipt under that contract, it cannot be maintained that the Warehouse & Security Company's right to the cotton can stand on the ground of ratification.

It is urged by the plaintiffs' counsel that as the company had parted with their money on the 8th, they cannot be said to have been induced to do so by a receipt not in existence till the 9th. This position is well taken, for although the check was given on an executory agreement, yet, as matter of fact, it was delivered to Biddle & Co., and by them put to their credit in the bank on the 8th, and at least twenty-four hours before the receipt was delivered. It is

difficult, therefore, for the defendants to stand upon a claim of superior right to the cotton as *bona fide* purchasers for value. Whatever right they have as against the plaintiffs, must rest upon another principle, the principle of *estoppel in pais*. We have already seen that if on Friday, the 8th, when the company first called upon the warehouseman for a receipt for the cotton, it had been refused, and they had been told that Biddle & Co. had no right to any receipt, the company would have been at liberty to have demanded their check from Biddle & Co., or to have possessed its proceeds then lying to their credit in the bank, either on the ground of fraud or of the non-performance of the condition, on which the check was given. They were lulled into security by the statement of the warehouseman, that the receipt would be delivered on the following day, when the delivery of the cotton would be complete. For this statement, the plaintiffs were probably not responsible, but there was no lack of vigilance on the part of the Warehouse & Security Company in waiting till the next day, and therefore their right to such remedy of recaption remained in full vigor on the 8th. On Saturday, the plaintiffs, by their own voluntary act, caused the delivery of the receipt which the warehouseman gave on the order of Biddle & Co. This act, the plaintiffs did with full knowledge that the cotton had not been paid for by Biddle & Co., and that according to the usage of business, it was not to be paid for until the following Tuesday, the 12th of May. It is apparent that they relied upon the responsibility and business integrity of Biddle & Co. They are chargeable with the negotiability of the receipt, because they imposed no limit as to its form, and the warehouseman's did not exceed his authority in giving it in that form. It is no strained inference to say that plaintiffs probably acted upon the assumption that Biddle & Co. needed the receipt to raise the money to pay for the cotton on the following Tuesday, and that they intended to give them the facility for so doing.

But however that may be, they voluntarily armed that firm with an instrument which was the evidence of title and possession, and upon which any *bona fide* purchaser for value could have acquired a perfect title to the cotton as against them. Morally considered, there is but small difference between the party who might advance his money on presentation of that receipt, and the party that, in good faith, had before done so upon an order for the receipt under an executory arrangement, of which the delivery of the receipt

was at once the consummation and consideration. But, legally speaking, the difference rests upon a sound principle of commercial law, which, as the learned counsel for the plaintiff says, "goes by right, and not by faith" (although *faith* is the basis of all commerce). The plaintiffs are, therefore, able to say to the defendants, "you did not part with your money on the receipt we gave on *Saturday*, because you had already given it to Biddle & Co. on *Friday*." But did not the Warehouse & Security Company part with something which, under the circumstances of this case, might have been of equal value to them, and have they not lost that by the act of giving the receipt, and the delay of plaintiffs in notifying them of Biddle & Co.'s insolvency until the 13th of May, when its pursuit was hopeless ?

If this question be answered in the affirmative, we do not see why the principle of equitable estoppel, already alluded to, does not step in to protect the defendants. It appears that on Friday the credit which the deposit of the check of $44,000 gave to Biddle & Co. in their bank was intact, as their balance on that day was more than $50,000. It appears, also, that on Saturday, and at the hour when the receipt was delivered, which was after the close of banking hours, the same account was in credit, $31,878.96, which is a sum greater than the company had loaned on the security of the 226 bales of cotton, as the computation made in the invoice will show. This was a tangible indemnity, which, had not the receipt been given, the company could have seized by legal process, and which probably Biddle & Co. would voluntarily have returned to have avoided arrest and prosecution for fraud. These were rights which the company possessed, and could have exercised to save themselves from loss, but which, as the case shows, were gone when the plaintiffs repudiated the receipt on the 13th of May.

It is not necessary to an equitable estoppel that the party should willfully intend to mislead; nor that the party who claims the estoppel shall have acted affirmatively upon it. It is enough if he has been induced thereby to refrain from such action as lay in his power by which he might have retrieved his position and saved himself from loss.

This question has been so ably and fully considered by the Court of Appeals in the late case of *Continental National Bank* v. *Bank of the Commonwealth*, 50 N. Y. 575, that its further discussion seems wholly unnecessary. That case, and those cited in the

opinion, establish, as it seems to us, that a clear equitable estoppel arises upon the undisputed facts of this case against the plaintiffs, and in favor of the defendants, because by their voluntary acts, delivering the warehouse receipt, they enabled Biddle & Co. to consummate the pledge in such form as apparently to give possession and title, and by that means and by their neglect, the Warehouse & Security Company were deprived of valuable modes of redress which men of ordinary prudence and diligence would have pursued.

The plaintiff did not ask to go to the jury upon any of the questions of fact upon which the estoppel arises; and, indeed, we think there was no conflict of evidence to carry the question to the jury, had such request been made. So far as the requests, incidentally or argumentatively, affect the question through knowledge of the custom or the usages of dealings in cotton, they may be assumed as true without changing the right of the defendants.

There is nothing, we think, in conflict with the views above expressed on the question of estoppel in *Taft* v. *Chapman*, 50 N. Y. 445, in which the owner of the bonds had done no act evoking the application of the principle to him; or in *Barnard* v. *Campbell*, 56 N. Y. 456, which was decided distinctly upon the ground that the doctrine of estoppel had no foothold on the facts of the case. "The defendants here," says Allen, J., in that case, "at no time had any statement or declaration of the plaintiffs upon which to rely, and were not led to act, or to forbear to act, by any documentary evidence of title in Jeffries, emanating from them." It would be difficult to say this with truth in the case before us. *Casco Bank* v. *Keene*, 53 Me. 103; *Irving Bank* v. *Wetherold*, 36 N. Y. 335; *Delaware Bank* v. *Jarvis*, 20 id. 226 ; *St. John* v. *Roberts*, 31 id. 441; *Brown* v. *Montgomery*, 20 id. 287 ; *Knights* v. *Wiffen*, Law R., 5 Q. B. 660 ; *Manuf. & Trad. Bank* v. *Hazard*, 30 N. Y. 226.

We are of opinion that the motion for new trial should be denied, and that the defendant should have judgment upon the verdict, with costs.

*Ordered accordingly.*